NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-359                                            Appeals Court

BARBARA GOUDREAULT  vs.  ERIK NINE.

No. 14-P-359.

Essex.      December 8, 2014. - April 30, 2015.

Present:  Grainger, Agnes, & Sullivan, JJ.

Medical Malpractice, Tribunal, Expert opinion. Negligence, Medical malpractice, Doctor, Expert opinion, Causation. Doctor.

Civil action commenced in the Superior Court Department on October 30, 2012.

A motion to dismiss was heard by Richard E. Welch, III, J.

Barrie E. Duchesneau for the plaintiff.
Allyson N. Hammerstedt for the defendant.

AGNES, J.  The plaintiff, Barbara Goudreault, filed a medical malpractice suit alleging that on February 7, 2011, the defendant radiologist Erik Nine, M.D., failed to properly interpret her mammogram results and recommend necessary follow-up tests, delaying her breast cancer diagnosis and worsening her prognosis.  In accordance with G. L. c. 231, § 60B, the matter

was referred to a medical malpractice tribunal, with the only issue being that of causation. After a hearing, the tribunal concluded that there was insufficient evidence "to raise a legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B, inserted by St. 1975, c. 362, § 5.[1] For the reasons that follow, we reverse.

Background. We first set out the evidence before the tribunal, in the light most favorable to Goudreault. See Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. 86, 91 (2010).

a. Course of diagnosis and treatment. On July 26, 2010, Goudreault went to Anna Jaques Hospital for a routine bilateral screening mammogram, which was found to be abnormal. The reporting doctor (not the defendant) concluded, relevantly here, that "[i]n the left lower outer breast there [was] a [one-centimeter] ovoid well-defined nodule which [was] new compared to the prior studies," adjacent to which was, in the left upper outer breast, a "small cluster [of] microcalcifications . . . associated with a small well defined density." The doctor recommended a bilateral breast ultrasound, spot compression mammograms and true lateral mammograms of both breasts, and

---

[1] After the tribunal's decision, Goudreault did not post the $6,000 bond required by the statute in order to proceed, and her action was thus ordered dismissed. This appeal is from the resulting judgment. See Lucas v. Collins, 51 Mass. App. Ct. 30, 30 (2001), citing McMahon v. Glixman, 379 Mass. 60, 63-64 (1979).

magnification mammograms of the left upper outer breast.  The doctor's report assessed Goudreault in "category 0" -- "need[s] additional imaging evaluation."

Complying with the recommendation, four days later, on July 30, 2010, Goudreault returned for the diagnostic mammograms and ultrasound.  The same doctor (again, not the defendant) reported the findings, which included that "[t]he microcalcifications in the left upper outer breast are two in number and are both rounded.  This is not worrisome appearance but they are new since the prior mammogram, and 6-month follow-up is recommended. The small nodular density that they appear to be associated with corresponds to a [normal appearing] lymph node on targeted ultrasound."  No further work-up was recommended for the lymph node, and while the doctor concluded that the "[n]ew microcalcifications in the left upper outer breast do not appear suspicious, . . . surveillance would be prudent and [a] 6-month follow-up magnification mammogram of the left upper outer breast is recommended."  Goudreault was assessed as within "category 3," indicating "[p]robably benign finding:  [s]hort interval follow-up suggested."

On February 7, 2011, Goudreault returned to Anna Jaques Hospital for her six-month follow-up left breast mammogram.  The defendant interpreted and reported the results of her mammogram

films.[2]  Dr. Nine reported that there was "no evidence of a new dominant mass."  He made note of the calcifications within the left upper outer quadrant, stating that they had not significantly changed in size, number, or appearance from the prior exam and were "likely benign."  Dr. Nine reported there were "no new suspicious clustered microcalcifications[,] architectural distortions[,] or skin abnormalities."  He did not recommend any immediate further tests, such as a biopsy or a magnetic resonance imaging (MRI) study.  He instead recommended continued surveillance with another six-month follow-up evaluation "to assure interval stability."  He assessed Goudreault as remaining in category 3.  Goudreault did not attend her six-month follow-up, despite efforts by the hospital to reach out to her and remind her of the appointments.[3]

On February 13, 2012, approximately one year after Dr. Nine read her mammogram, Goudreault returned to Anna Jaques Hospital for follow-up diagnostic mammography.  The radiologist (who was not Dr. Nine) noted that the findings of the left breast

---

[2] Dr. Nine only read and reported on Goudreault's February 7, 2011, mammogram films, and no other tests that she underwent at any time.

[3] Goudreault missed her six-month follow-up appointment on August 8, 2011.  On September 14, 2011, she was telephoned and a new appointment was rescheduled for September 19, 2011, which Goudreault missed.  After making telephone calls and sending four letters (one by certified mail) to Goudreault, a nurse reached out on January 23, 2012, to Dr. Castagliola, Goudreault's primary doctor, to initiate contact with her again.

mammogram were "highly suspicious for malignancy." The report indicated that there was "a lobular mass . . . with architectural distortion measuring approximately [two centimeters]" in the upper outer quadrant posteriorly, with "new clustered pleomorphic microcalcifications" to the anterior.[4] Goudreault was now assessed in "category 5": "Highly suspicious for malignancy and appropriate action should be taken."

Based on the February 13, 2012, findings, the doctor recommended further tests. Goudreault underwent a left breast biopsy on March 15, 2012, which revealed the presence of invasive ductal carcinoma. Goudreault returned on April 6, 2012, for a diagnostic breast MRI. That MRI documented "a 2.8 x 1.2 x 1.0 cm in diameter enhancing mass in the upper outer left breast" with some anterior extension. The entire area measured approximately 6.5 centimeters, and the known malignancy had "tendrils of enhancement extending anteriorly from it which [were] worrisome for regional spread of [the] disease." On May 17, 2012, Goudreault underwent a recommended left breast modified radical mastectomy, followed by postoperative chemotherapy.

---

[4] The report noted that a contemporaneous ultrasound "confirm[ed] a solid irregular shaped mass in the upper outer quadrant with an associated suspicious rounded and micro lobular axillary lymph node."

b.  Expert opinion evidence.  On November 1, 2013, Goudreault presented an offer of proof to the tribunal that included two letters from medical experts Kishan Yalavarthi, M.D.,[5] and Andrew Schneider, M.D.[6]

In his letter Dr. Yalavarthi, a radiologist, asserted that, in his professional opinion, and to a reasonable degree of medical certainty, Goudreault suffered a significant delay in the diagnosis and treatment of her breast cancer as the direct result of the substandard care rendered to her by Dr. Nine. Specifically, after Dr. Yalavarthi reviewed the mammogram films dated February 7, 2011, he identified two problems with the care rendered by Dr. Nine on that day.  First, Dr. Nine "failed to identify and report a concerning area of a larger, more solid, asymmetric and spiculated density with architectural distortion in the upper outer region of the left breast at the 1-2 o'clock position."  This area had "clearly increased in size" since the mammogram and ultrasound in July of 2010, in Dr. Yalavarthi's

---

[5] Dr. Yalavarthi is a physician licensed to practice medicine in Missouri.  He is board certified in diagnostic radiology by the American Board of Radiology and familiar with the standard of care for radiologists in Massachusetts during the relevant time.

[6] Dr. Schneider is a physician licensed to practice medicine in Florida.  He is board certified in internal medicine and oncology and is familiar with the diagnosis, treatment, staging, prognosis, and natural progression of breast cancer.

opinion.[7]  Secondly, Dr. Nine "failed to offer, order, and/or perform further diagnostic/imaging studies to rule out cancer, such as ultrasound, MRI, and biopsy."  Dr. Yalavarthi's letter concluded that, "[a]s a direct result of the substandard care rendered by Dr. Nine, Ms. Goudreault's left breast cancer was not diagnosed until March 2012.  Had Dr. Nine rendered care in accordance with the accepted standard of care as outlined above,[8] Ms. Goudreault would have undergone additional left breast imaging such as an ultrasound, MRI and/or biopsy and, more likely than not, her cancer would have been diagnosed as early as February 2011."

---

[7] Dr. Yalavarthi added, "Having reviewed the mammogram and ultrasound films dated [February 7, 2011,] and [February 13, 2012], it is my professional opinion that the lobular mass seen on the [latter] mammogram is the same area of asymmetric and spiculated density with architectural distortion seen in the 1-2 o'clock position on the [February 7, 2011,] mammogram and ultrasound films that had now increased in size by about [forty percent] which Dr. Nine failed to identify and report."

[8] Previously, Dr. Yalavarthi had set out the standard of care as follows:

"The accepted standard of care from 2010 through the present requires the average qualified radiologist interpreting mammogram films to identify and report the presence of any abnormality in the breast.  If a mammogram demonstrates the presence of an abnormal and/or worrisome finding suspicious for malignancy, then the accepted standard of care requires the average qualified radiologist to offer, order, and/or perform further diagnostic/imaging studies to rule out cancer, such as ultrasound, MRI, and biopsy."

In a second expert opinion letter, Dr. Schneider, an oncologist, asserted that, in his professional opinion and to a reasonable degree of medical certainty, as a direct result of the deviations from the accepted standard of care by Dr. Nine as set forth in Dr. Yalavarthi's expert opinion letter, Goudreault's left breast cancer "went undiagnosed and untreated for over [thirteen] months, resulting in a significant increase in size of the tumor and spread beyond her left breast to her lymph nodes, and a worsened prognosis and loss of chance for cure."  Dr. Schneider also opined, "Had Dr. Nine rendered care in accordance with the accepted standard of care as outlined above, Ms. Goudreault would have undergone further diagnostic/imaging studies such as ultrasound, MRI, and/or biopsy and, more likely than not, her cancer would have been diagnosed as early as February 2011, when it was at an earlier stage and amenable to cure."

Discussion.  a.  Standard of review.  A plaintiff's offer of proof before a medical malpractice tribunal must "(1) show that the defendant is a provider of health care as defined in G. L. c. 231, § 60B; (2) demonstrate that the health care provider did not conform to good medical practice; and (3) establish resulting damage."  Saunders v. Ready, 68 Mass. App. Ct. 403, 403-404 (2007).  See Santos v. Kim, 429 Mass. 130, 132-134 (1999); Washington v. Cranmer, 86 Mass. App. Ct. 674, 675

(2014).[9]  Because the determination of sufficiency before a tribunal is a factual one, Kopycinski v. Aserkoff, 410 Mass. 410, 413 (1991), the tribunal's task is "akin to a trial judge's evaluation of a motion for a directed verdict."  Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. at 91, citing Little v. Rosenthal, 376 Mass. 573, 578 (1978).  The tribunal may not examine the weight or credibility of the evidence.  Cooper v. Cooper-Ciccarelli, supra.  Instead, it must view the evidence contained in the offer of proof in the light most favorable to the plaintiff.  Ibid., citing Blake v. Avedikian, 412 Mass. 481, 484 (1992).  Under this standard, the tribunal must find the plaintiff's offer of proof sufficient "if anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.  If any such combination of circumstances could be found it is, for present purposes, immaterial how many other combinations could have been found which would have led to conclusions adverse to the plaintiff."  Kelly v. Railway Exp. Agency, Inc., 315 Mass. 301, 302 (1943).  See Thou v. Russo, 86 Mass. App. Ct. 514, 516

---

[9] The relevant standard of care is the one that applies to "the average qualified physician in his or her area of specialty."  Medina v. Hochberg, 465 Mass. 102, 106 (2013).  This question can generally only be answered with the aid of expert opinion.  See Kapp v. Ballantine, 380 Mass. 186, 190 & n.4 (1980).

(2014). In particular, this standard requires the tribunal to draw all reasonable inferences favorable to the plaintiff and prohibits the tribunal from drawing any unfavorable inferences, an option reserved for the fact finder at trial. See McLaughlin v. Bernstein, 356 Mass. 219, 224 (1969). See also Graci v. Massachusetts Gas & Elec. Light Supply Co., 7 Mass. App. Ct. 221, 225 (1979).

It is the plaintiff's burden to introduce an "'offer of proof' that persuades the tribunal 'that a legitimate question of liability ha[s] been raised.'" Nickerson v. Lee, 42 Mass. App. Ct. 106, 109 (1997), quoting from Little v. Rosenthal, 376 Mass. at 578-579. Ordinarily, such analysis must be undertaken for each of the three aforementioned elements before the tribunal. Here, however, we may narrow our focus to the only contested issue in the case -- that of causation.[10] Testimony of an expert that a causal relation is "possible, conceivable or reasonable, without more," is not enough to establish causation. Berardi v. Menicks, 340 Mass. 396, 402 (1960). Likewise, such testimony must go beyond pure speculation, conjecture, or assumption. See Blood v. Lea, 403 Mass. 430, 434 (1988); Keppler v. Tufts, 38 Mass. App. Ct. 587, 592 (1995).

---

[10] There is no question that Dr. Nine was shown to be a provider of health care, and defense counsel candidly and correctly acknowledged to the tribunal that Goudreault had met her burden, for the tribunal's purposes, to establish the standard of care and its breach.

b.  <u>Causation</u>.  Viewing the evidence in the light most favorable to Goudreault, the tribunal was presented with an offer of proof, including expert witness opinions from Dr. Yalavarthi and Dr. Schneider, that both identified Dr. Nine's deviation from the appropriate standard of care on February 7, 2011, and the relationship between that deviation and the harm suffered by Goudreault.  The offer of proof here explicitly stated that, when Dr. Nine read Goudreault's February 7, 2011, mammogram films and failed to report an enlarged mass in the upper outer region of the left breast and order further tests immediately, he deviated from the appropriate standard of care.  Both doctors specifically identified the causal relationship between that departure on February 7, 2011, and a delay in diagnosis of her breast cancer, leading to a worsened prognosis, and actual harm.[11]

---

[11] The harm suffered by Goudreault as a result of losing the benefit of an accurate mammogram reading and appropriate follow-up recommendation by Dr. Nine is no less concrete than the harm suffered by plaintiffs in the loss of chance for a cure cases. See <u>Matsuyama</u> v. <u>Birnbaum</u>, 452 Mass. 1, 3 (2008) ("[T]he loss of chance doctrine views a person's prospects for surviving a serious medical condition as something of value, even if the possibility of recovery was less than even prior to the physician's tortious conduct.  Where a physician's negligence reduces or eliminates the patient's prospects for achieving a more favorable medical outcome, the physician has harmed the patient and is liable for damages.  Permitting recovery for loss of chance is particularly appropriate in the area of medical negligence"); <u>Renzi</u> v. <u>Paredes</u>, 452 Mass. 38, 39-40 (2008); <u>Curreri</u> v. <u>Isihara</u>, 80 Mass. App. Ct. 193, 195-196 (2011) ("In a medical malpractice case, the burden is on the plaintiff to

Dr. Yalavarthi stated that, had Dr. Nine made the appropriate diagnosis on February 7, 2011, and ordered the appropriate tests, it is more likely than not that Goudreault would have benefitted from a diagnosis of cancer "as early as February 2011."[12]  Dr. Schneider reiterated that, "more likely than not, her cancer would have been diagnosed as early as February 2011, when it was at an earlier stage and amenable to cure."  Therefore, based on Dr. Yalavarthi's and Dr. Schneider's expert opinions, it may be inferred that had Dr. Nine complied with the appropriate standard of care, Goudreault's cancer would have been diagnosed nearly one year earlier, and at a time when it was "amenable to cure."  These expert opinions, along with the relevant medical records, satisfied Goudreault's obligation

establish a causal connection between the alleged negligence of a defendant and any damages. . . .  Under a loss of chance theory, a 'plaintiff must prove by a preponderance of the evidence that the physician's negligence caused the plaintiff's injury, where the injury consists of the diminished likelihood of achieving a more favorable medical outcome'"), quoting from Matsuyama v. Birnbaum, supra at 17.

[12] Dr. Yalavarthi, specifically, outlines how important accurate results are in routine periodic mammograms, stating that "[i]t has been well recognized from 2010 to the present that breast imaging studies, such as mammograms, are a valuable screening tool used to detect changes in the breast tissue that are suspicious for malignancy."  Dr. Yalavarthi goes on to say, as noted previously, that "[h]ad Dr. Nine rendered care in accordance with the accepted standard of care as outlined above, Ms. Goudreault would have undergone additional left breast imaging such as ultrasound, MRI/or biopsy and, more likely than not, her cancer would have been diagnosed as early as February 2011."

to make an offer of proof to the tribunal that establishes the existence of both medical negligence and causation. See DiGiovanni v. Latimer, 390 Mass. 265, 269 (1983) (tribunal may not appraise weight or credibility of evidence); Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. at 91 (same).

Dr. Nine argues that his care on February 7, 2011, at most, delayed Goudreault's diagnosis by six months because he recommended that she follow up with another mammogram six months from the date he read and interpreted her mammogram. It was Goudreault herself, Dr. Nine points out, who chose not to attend her six-month follow-up appointment, despite receiving calls and letters from the office. Under this theory, because only six months of delay were attributable to Dr. Nine's deviation from the standard of care, and the remainder was attributable to Goudreault, she had an obligation to submit an offer of proof addressing the harm caused by the six-month delay. Instead, the theory goes, because both of Goudreault's expert opinion letters refer to a delay of thirteen months, they necessarily fall short. While Dr. Nine is correct that his conduct was not the only factor that contributed to the thirteenth-month delay, this does not diminish the sufficiency of Goudreault's offer of proof. Based on the opinions of Goudreault's experts, Dr. Nine violated the standard of care he owed to her when he failed to order further diagnostic tests immediately at her February 7,

2011, exam -- tests that would have detected the cancer at the time.  When a negligent act, such as one yielding a failure to diagnose cancer, is followed by a reasonably foreseeable intervening event, such as a patient's delay in attending a routine follow-up appointment that eventually leads to the diagnosis of cancer, "the causal chain of events remains intact and the original negligence remains a proximate cause of a plaintiff's injury."  Delaney v. Reynolds, 63 Mass. App. Ct. 239, 242 (2005).[13]  It is not unforeseeable that a patient might delay undergoing a routine, six-month follow-up examination when informed erroneously that there has been no change in her condition.[14]

Conclusion.  We determine that the plaintiff presented a sufficient offer of proof to raise a "legitimate question of liability appropriate for judicial inquiry."  G. L. c. 231,

---

[13] It is only when "the intervening event [is] of a type so extraordinary that it could not reasonably have been foreseen, that [the] new event is deemed to be the proximate cause of the injury and relieves a defendant of liability."  Delaney v. Reynolds, 63 Mass. App. Ct. at 242.

[14] It is a permissible inference that Goudreault would have responded promptly to obtain follow-up diagnostics if Dr. Nine had recommended them in February of 2011, because when Goudreault was told for the first time in February of 2012 that her scans were suspicious for cancer and that immediate further testing was necessary, she took immediate action.  To determine that Goudreault would have delayed scheduling a follow-up exam or testing even if Dr. Nine had read her mammogram correctly requires speculation and a weighing of the evidence that is not the function of the tribunal.

§ 60B.  The judgment is reversed, the finding of the tribunal is set aside, and a new tribunal finding shall enter in favor of the plaintiff.  The case is remanded for further proceedings consistent with this opinion.

<u>So ordered</u>.